**UNITED STATES of America,**

v.

**Paul James HANSEN, Defendant.**

**No.  CR. 01–10196–NG.**

United States District Court,
D. Massachusetts.

Feb. 14, 2003.

James F. Lang, John T. McNeil, United States Attorney's Office, John Joseph Moakley Federal Courthouse, Boston, MA, for Plaintiffs.

Charles A. Clifford, Law Offices of Charles A. Clifford, Angela G. Lehman, Attorney at Law, Charlestown, MA, for Defendant.

## MEMORANDUM RE: MOTION FOR A NEW TRIAL AND SENTENCING

GERTNER, District Judge.

A jury convicted Paul Hansen ("Hansen"), 25 years old, of four charges: Count One charged robbery affecting commerce (18 U.S.C. § 1951(a), the Hobbs Act) and aiding and abetting said robbery (18 U.S.C. § 2); Count Two charged conspiracy to commit the same robbery (18 U.S.C. § 1951(a)); Count Three charged use of a firearm in connection with a crime of violence thereby causing a death by murder (18 U.S.C. §§ 924(c) & 924(j)); and Count Four charged obstruction of justice (18 U.S.C. § 1623).[1]

Hansen admitted that on July 28, 1996, he and co-defendant Brendan Brennan stole a white minivan. Theft of that car alone would hardly have been a federal offense, let alone one exposing Hansen to the maximum penalty that flows from conviction on Counts One—Three, namely, life imprisonment.

What made Hansen's crime a federal one, subject to extraordinary penalties, was the later use of that minivan by others and Hansen's relationship to those people and events. Three days later, on July 31, 1996, the minivan was used in the robbery of a Dunbar armored car. The alleged perpetrators were other individuals—John Fidler and Dennis Bird—individuals who are not co-defendants in this case. (Indeed, as of the time of the trial they had not been apprehended.) During the robbery, one of the perpetrators, using a semiautomatic weapon, brutally killed Edward Kubera, a Dunbar guard.

---

1. The obstruction charge derived from Hansen's November 20, 1996 grand jury appearance at which he denied having any role in the armored car robbery that is the subject of the first three counts.

There is no doubt that Hansen was not present during the robbery. Nor was there any indication that Hansen knew when or where the robbery would take place, or what was its specific object. Nevertheless, the jury found Hansen responsible on all four counts.

The central issue in the trial was the relationship between Hansen's theft of the van, on the one hand, and the armored car robbery and its bloody consequences, on the other. To a degree, even after conviction, the same issues consumed the sentencing proceeding. Although I already have ruled from the bench and announced Hansen's sentence, I have restated my findings in this memorandum because of the complexity of the issues.

### A. Motion for a New Trial

In a motion for a new trial, the defendant mounted a single challenge to an evidentiary ruling. Federal authorities recorded a jailhouse conversation between Hansen and Stephen Brennan, the father of coconspirator Brendan Brennan. Special Agent Travaglia, who overheard and presided over the taping of the conversation, attested to its authenticity. In his post-verdict submission, the defendant challenged the admission of the Stephen Brennan tape. Defense counsel claimed that unless Stephen Brennan himself testified, the tape was somehow inadmissible hearsay, and deprived Hansen of his confrontation rights.[2]

■ I denied the motion for a new trial. The government was seeking to introduce *Hansen's* statements on the tape, which were entirely admissible admissions of a party-opponent under Fed.R.Evid. 801(d)(2). Stephen Brennan's questions of Hansen were admitted only to provide context under Fed. R. 106, not for their truth. *See United States v. McDowell*, 918 F.2d 1004, 1007–8 (1st Cir.1990); *U.S. v. Ariza Ibarra*, 605 F.2d 1216, 1224 (1st Cir.1979). Defense counsel's proposed cross-examination of Brennan about his criminal record, for example, would have been irrelevant.

In any event, Stephen Brennan was available to the defendant as well. But Hansen did not call him. Nor did counsel bother to cross-examine Agent Travaglia on the subject of Stephen Brennan's record, even though the government opened the door during its questioning.

■ Thus, the issues which defense counsel raised in the motion for a new trial and for acquittal were insubstantial. Of far greater concern to the Court were issues that counsel did not raise and avenues that counsel did not pursue, some of which the Court had to grapple with at sentencing.[3]

---

2. On October 18, 2000, Brendan Brennan's father, Stephen, recorded a conversation with Hansen in which Hansen admitted that he and Brendan Brennan were best friends in July 1996; that John Fidler and Dennis Bird approached Hansen was approached Hansen to steal a car; that Fidler and Bird set a deadline for stealing a car, which they communicated to Hansen; that Hansen attempted to steal several cars for them, but failed; that Hansen then sought out Brendan Brennan to assist him; and that Hansen drove the stolen car after Brennan started it. In addition, Hansen also indicated that he did not know what the car would be used for and denied responsibility for the armored car robbery, or

the killing of Kubera. He said, "[w]e didn't know nothing about nothing," and "[i]t didn't matter what, it wasn't [for] us to ask."

3. For example, as I explain below, Hansen's vicarious liability for the murder committed by his co-conspirators derives from *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and its progeny. The First Circuit has agreed with other courts that "due process constrains the application of *Pinkerton* where the relationship between the defendant and the substantive offense is slight." *United States v. Collazo–Aponte*, 216 F.3d 163, 196 (1st Cir.2000) (quoting *United States v. Castaneda*, 9 F.3d 761, 766 (9th

## B. *Sentencing*

### 1. *Background to the Charges*

Cir.1993)), *vacated on other grounds*, 532 U.S. 1036, 121 S.Ct. 1996, 149 L.Ed.2d 1000.

Yet the defense did not even try to argue that due process precluded holding Hansen— a young car thief, not privy to the details, whose "participation" in the conspiracy occurred three days prior to the heist—responsible for the separate, murderous acts of much older armed robbers. Perhaps, in the final analysis, I still might have concluded that Hansen's relationship to the murder was more than "slight." Yet one must wonder where the outer limits of accomplice liability lie. If a person merely had loaned the robbers a ski mask that was then used in the robbery, could he or she likewise be held responsible for murder?

The suggestion in *Collazo–Aponte* and *Castaneda* that "the foreseeability concept underlying *Pinkerton* is also the main concern underlying a possible due process violation," *id.*, is not satisfying. Indeed, it is quite simply illogical to say that *Pinkerton*, which is defined by foreseeability, could somehow be *more* narrowly "constrained" by due process if due process requires nothing more than foreseeability. "Foreseeability" is the language of negligence law. It is not a usual criminal law concept and surely not a concept that puts meaningful due process limits on criminal liability.

The facts of *Castaneda* suggest that something more than mere foreseeability is at work. In that case, the court found that the wife of a principal in a drug distribution network could not be held liable for firearms charges because she had only a "marginal role" in the conspiracy. 9 F.3d at 767. While the court framed its decision in terms of "foreseeability," its ostensible reasoning flies in the face of other language in the opinion acknowledging an obvious "nexus between drugs and firearms." *Id.* Surely *any* participant in a drug conspiracy, major or marginal, could *foresee* that firearms might come into play. Something deeper and more visceral must have caused the court to conclude that it was unacceptable to impose firearm penalty enhancements on a minor participant.

At least one court has treated the foreseeability and due process inquiries separately. *See United States v. Alvarez*, 755 F.2d 830

Two counts grow out of the same nexus of facts. In Count One, Hansen was charged with aiding and abetting those (11th Cir.1985) (conducting separate "reasonable foreseeability" and "individual culpability" inquiries). "We have not found … any authority for the proposition that all conspirators, regardless of individual culpability, may be held responsible under *Pinkerton* for reasonably foreseeable but originally unintended substantive crimes. Furthermore, we are mindful of the potential due process limitations on the *Pinkerton* doctrine in cases involving attenuated relationships between the conspirator and the substantive crime." *Id.* at 850.

On reflection, even the foreseeability language of *Pinkerton* itself appears more illustrative than exclusive. *See Pinkerton*, 328 U.S. at 647–48, 66 S.Ct. 1180 ("A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a *necessary* or *natural* consequence of the unlawful agreement") (emphasis added). I also have not seen any court decisions that consider the significance of the "necessary" and "natural" language. In short, the law has not yet developed clear and cogent standards to assess the outer due process limits of *Pinkerton*.

Academic commentators also are troubled by these questions. "Why does the law treat all secondary parties alike, despite their varied levels of contribution to crime? Why is the person who renders minor encouragement or trivial assistance treated the same as the mastermind behind a crime? Why does the criminal law potentially equate the villainy of an Iago with the loyalty of a spouse who furnishes lunch to her perpetrator-husband?" Joshua Dressler, *Reassessing the Theoretical Underpinnings of Accomplice Liability: New Solutions to an Old Problem*, 37 Hastings L.J. 91, 92 (1985). "[E]ven though those who intentionally, unjustifiably, and inexcusably aid others in criminal conduct should be punished, the degree of an accomplice's crime and punishment should depend on the presence or absence of a causal connection between the secondary party's assistance and the ultimate injury." *Id.* at 86.

who in fact committed the robbery of the Dunbar armored car on July 31, 1996. In Count Two, Hansen was charged as a co-conspirator in the same offense.

With respect to aiding and abetting, I instructed the jury that the government must prove that Hansen "willfully associated himself in some way with the crime" and "willfully participated in it as he would in something he wished to bring about."[4] In addition, I admonished the jury, *inter alia*, that the "government must prove that Mr. Hansen was a participant at the time of the offense or at an earlier time and not just a knowing spectator, someone who picked up information off the street to talk about."[5]

With respect to the conspiracy, I instructed the jurors that in order to return a guilty verdict they must find that a conspiracy existed to commit a Hobbs act robbery between others, that the defendant "willfully joined" it, and that he "agreed to participate in the conspiracy with knowledge of its unlawful purpose and with the specific intent of furthering its objectives."[6]

Count Three, by far the most serious count, charges Hansen with responsibility as a co-conspirator beyond the armored car robbery itself, to include a coconspirator's use of a firearm in furtherance of the Dunbar armored car robbery, and finally, the death of Mr. Kubera. With respect to the coconspirator's acts, the government had to show that during the armored car robbery conspiracy one of the participants "used or carried a firearm or firearms," that this occurred during the time of Hansen's membership in the conspiracy, and that the firearms were used "in furtherance" of the conspiracy.

To link Hansen to that complex of acts, however, the government did not have to show that guns and even murder were objects of the conspiracy he joined. Rather, under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the government need only have shown with respect to Hansen that the use of firearms was reasonably foreseeable. *See id.* at 648, 66 S.Ct. 1180.[7]

Finally, extending *Pinkerton* foreseeability principles still further, the government sought to hold the defendant accountable for the murder of Mr. Kubera, on the basis that the shooting was a "foreseeable consequence of the use of a firearm in the course of a conspiracy."[8]

The jury concluded that the government met its burden of proof on all three counts, largely through the testimony of Brendan Brennan.[9] Without Brennan, there was no case. If the evidence were only that Hansen somehow figured out that the van was likely to be used in an armored car robbery, because the person who asked him to steal it had a reputation for "doing" such robberies, there would have been a substantial question as to whether that evidence was sufficient for a conviction under Count Three.

**4.** Jury Instructions at 4. The instructions were published to the jury in writing and docketed [document # 46].

**5.** *Id.* at 5.

**6.** *Id.* at 8.

**7.** I instructed that Hansen had to have "reasonably foreseen that the crime of using or carrying a firearm during and in relation to the Hobbs Act conspiracy might be committed by one or more of his coconspirators." *Id.* at 12.

**8.** *Id.* at 14.

**9.** Brennan, who was originally sentenced to 320 months before Judge Woodlock, received a substantial sentence reduction based upon his agreement to testify against Hansen.

■ But the government offered more. Brennan, through a series of questions that were at least arguably leading,[10] and to which defense counsel did not object, testified that the defendant arranged to steal the van for John Fidler; that Fidler told Hansen that "they" needed the van for an armored car robbery; and further, that guns would be used in the robbery. Brennan testified that he and Hansen knew that Fidler sought to take the place of other men who regularly did armored car heists, but who were apprehended after a celebrated robbery in Hudson, New Hampshire. Further, Brennan testified that he and Hansen discussed the fact that these armored car robberies resulted in killings. Finally, Brennan testified that their payment for the car theft was not a flat amount, but rather would be contingent on the amount that the robbers cleared in their armored car heist.[11]

10. "The test of a leading question is whether it suggests the answer desired by the examiner ... A question may be leading because of its form ... its detail, or be made suggestive by reason of the examiner's emphasis on certain words, the tone used by the examiner in asking the question as a whole, or by the examiner's nonverbal conduct. While not always the case, questions which may be answered either 'Yes' or 'No' are considered leading." 2 Michael H. Graham, *Handbook of Fed. Evid.* § 611.8 (5th ed.2001).

11. The testimony went as follows (based on the "rough" transcript currently available to me):

At some point after Brennan's release from prison he had a conversation with Hansen. Brennan reported that Hansen "told me that John Fidler asked him if he'd steal a car for him."
Q. And did he tell you what the purpose that John Fidler told him the car was for?
A. Yes.
Q. What did he say?
A. An armored car robbery.

\* \* \* \* \* \*

Q: And what did P.J. [nickname for Paul James Hansen] tell you about what John Fidler was doing to make money?
A. He said that they were robbing armored cars.
Q. And what else did he tell you about what John Fidler was doing?
A. He said like these, John and his crew were taking over for a bunch of guys that got arrested prior to that.
Q. Okay. And did he mention what other guys had gotten arrested?
A. Yes.

A. Yes, Anthony Shea.

\* \* \* \* \* \*

The government then asked Brennan about the nature of the conversation between Brennan and Hansen.
A. We were just talking about how the minivan was used and the crime itself, the two guards getting killed, and that they were arresting Anthony and his friends.
Q. Now, with specific reference to what P.J. told you about what John Fidler was doing in July of 1996, again, if you could explain what it was that Fidler was doing in relation to Anthony Shea?
A. Well, these guys had all got taken off the street, arrested for the other armored car robbery so, -
Q. Anthony Shea and who else?
At which point the witnesses listed several names.
The government continued:
Q. And what did P.J. tell you about that in relation to Mr. Fidler?
A. He said that like John and his crew were taking over for these guys.
Whereupon the witness described who had been on Shea's "crew," and that these individuals were now part of Fidler's crew.
The government continued:
Q. Now, at the time that P.J. Hansen told you that Fidler had approached him to steal a car for an armored car robbery, did he tell you what kind of car Fidler wanted?
A. Yes.
Q. And what did he tell about what kind of car Fidler wanted and why Fidler wanted that kind of car?
A. He said he wanted a minivan, and a minivan is used in that type of crime because to have sliding door, so you can, you know guess surprise on the guard, you can get in and out quicker, and take the seats out of the back.

In addition, Brennan testified that he and Hansen knew that they were supposed to dress a certain way while stealing the car, based on their dealings with other individuals who committed armored car robberies

Altogether, this testimony was tailored perfectly to the issues that the government had to prove. Brennan, in short, put all of the requirements of Counts One, Two, and Three into Hansen's mouth.

## C. *Guidelines Issues*

Count One (Hobbs Act robbery and aiding/abetting) and Count Two (conspiracy) are grouped together pursuant to the grouping principles in U.S.S.G. § 3D1.2 ("Group 1"). Count Three (use of a firearm causing death), however, must be grouped separately because the guideline and statutory provisions, U.S.S.G. § 2K2.4 and 18 U.S.C. § 924(c), require a consecutive term of imprisonment ("Group 2"). Count Four (obstruction of justice), may be grouped with the "Group 1" counts defining the underlying offense (the offense with respect to which the obstructive conduct occurred), under U.S.S.G. § 3D1.2(c). That section provides for a two-level enhancement to the base offense level.

### 1. *First Degree Murder or Second Degree Murder*

The critical question in "Group 1" is outlined in U.S.S.G. § 2B3.1(c)(1): If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111, then the relevant guideline is the First Degree Murder guideline, or U.S.S.G. § 2A1.1. In that case, the base offense level would be 43, with a two-level enhancement for obstruction of justice, for a total of 45.

If, on the other hand, the circumstances suggest that "the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted." U.S.S.G. § 2A 1.1. As the guidelines note: "The extent of the departure should be based upon the defendant's state of mind (*e.g.*, recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However, the Commission does not envision that departure below that specified in § 2A1.2 (Second Degree Murder) is

---

Brennan further testified that he helped Hansen obtain the van, after Hansen made repeated attempts to do so without success. Later, the government returned to the question of guns.
Did you have any conversation with P.J. about whether or not John Fidler would use guns in that robbery?
A. Yes.
Q. And what was that conversation?
A. That they would.
Q. Did you and P.J. have any discussions in general about what kinds of arms were used in armored car robberies?
A. Yes.
Q. And how often did you have these kinds of conversations with P.J.?
A. You know, not often, but, you know, we've had them.
Q. And what did you and P.J. discuss with respects to the kinds of arms that are used by armored car robbers in the course of a robbery?
A. Usually some type of machine-gun is used.
Q. And did you have any conversation about the purpose for using a weapon like a machine-gun?
A. Yes.
Finally, defense counsel interceded:
[Counsel]: Judge, I think I'm going to start objecting to the form of the questions.
THE COURT: Sustained.
[By the Prosecutor]
Q. Could you tell the jury the—what P.J. said and what you said about the nature of guns that were used in armored car robberies?
A. Yes, that a machine-gun would be used and work used for—a machine-gun is used for intimidation purposes.

likely to be appropriate." *Id.*, comment. (n. 1). Under those circumstances, the base offense level is 33 with a two-level enhancement for obstruction of justice, for a total of 35.

Based upon a total offense for first degree murder of 45 and criminal history category of VI, the Guidelines range would be life, with a 60–month consecutive term of imprisonment under Count Three. Based upon a total offense level for second degree murder of 35, the range is 292–365 months, enhanced by the 60–month mandatory minimum.

■ I concluded that the second degree murder guideline was the most appropriate. I did so because of the testimony I heard at trial concerning the circumstances surrounding the offense, the defendant's role, and his knowledge of what was about to happen. The defendant was 19. The people who enlisted him in stealing the van were at least ten years older, with a brutal reputation in Charlestown. While the law holds Hansen responsible for the foreseeable consequence of his acts, it is clear that his relationship to the armored car robbery that resulted in the tragic murder of Edward Kubera was tenuous. He had, at most, only the most general idea of the plans of Fidler and Bird. He did not know *when* the robbery would take place, *where*, or of *whom*. While Brennan suggests that Hansen knew that guns would be involved—semi automatic guns at that—Hansen had no control over how they would be brandished, or indeed, whether they would be used at all.

In this area, the guidelines permit me to make a more nuanced judgment as to what kind of sentence Hansen deserves than the

jury did. The jury may have found the killing "foreseeable" but I cannot conclude that it was "intentional." If there ever were a case in which the downward departure to a second degree murder guideline was appropriate, it is this one.[12]

I therefore will depart to a level 33 under U.S.S.G. § 2A1.1, n. 1, which, with the enhancement for obstruction of justice, yields a level 35.[13]

### 2. *Defendant's Criminal History and Background*

Paul Hansen was raised in a functional family, with loving parents and siblings. His early involvement with alcohol, illegal and prescription drugs soon evolved into an addiction, an addiction which entangled him with "friends" ready, willing, and able to commit a variety of offenses. As of the time of this offense, his record was substantial, the highest level under the guidelines (Category VI).

### D. *Conclusion*

For stealing a minivan, and his vicarious legal responsibility for the armed robbery and killing that followed, and for lying to the Grand Jury, Hansen was sentenced to the following: 240 months on counts one and two, to be served concurrently with each other, a term of 52 months on count four, to be served consecutively with counts one and two, and a term of 60 months on count three, to be served consecutively to the terms imposed on counts one, two and four. In addition, the defendant was obliged to make restitution to Dunbar Armored car in the amount of Three Thousand Seven Hundred Seventy–Five and 00/100 ($3,775.00) Dollars, imme-

---

12. Significantly, Judge Woodlock found the same for Brennan, prior to Brennan's sentencing reduction for substantial assistance to the government.

13. While a role reduction may have been otherwise required, I have taken that issue into account in the departure to second degree murder.

diately or through a court ordered schedule. Upon release from imprisonment, the defendant shall be placed on supervised release for five years; three years on Count One, Two, and Four; and five years on count three; all such terms to run concurrently.

SO ORDERED.