# United States Court of Appeals
## For the First Circuit

Nos. 03-1331, 05-1414

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL JAMES HANSEN,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Selya and Lynch, Circuit Judges,
and Smith,[*] District Judge.

Rosemary Curran Scapicchio for appellant.
Vijay Shanker, Attorney, Appellate Section, Criminal Division, United States Department of Justice, with whom Michael J. Sullivan, United States Attorney, and John T. McNeil, Assistant United States Attorney, were on brief, for appellee.

January 13, 2006

---

[*] Of the District of Rhode Island, sitting by designation.

**SMITH**, **District Judge**.  Paul James Hansen was convicted after a jury trial in the United States District Court for the District of Massachusetts for his role in stealing a minivan and his responsibility for the armed robbery and killing that followed. He now appeals both his conviction and sentence, bringing no less than eleven claims of error.  After careful review, we affirm.

## I.  BACKGROUND

We begin with an overview of the facts of this case, in the light most favorable to the Government as the prevailing party. The unfortunate friendship of Hansen and Brendan Brennan ("Brennan") spawned from their childhood association with the Boys' Club in Charlestown, Massachusetts, when the two were about twelve years old.  During their teen years, they became friendly with an older man from the neighborhood, Scott Sheehan ("Sheehan"), who made money by robbing banks.  Sheehan instructed his two young apprentices about various aspects of the criminal trade, including the finer points of stealing cars.  Under Sheehan's tutelage, the young men learned, for example, that to prevent police detection when stealing vehicles that were to be used in robberies, they should wear certain clothes such as nylon pants, long-sleeved shirts, hats, and gloves.

The pair wasted no time putting their newly acquired skills to use – between June, 1994 and the summer of 1996, Brennan was involved in stealing approximately 100 cars, with Hansen

participating in roughly 65-70 of these thefts.[1] Brennan's budding criminal career hit bumps in the road, however, when he was arrested and convicted of four different auto thefts in 1995 and 1996.

While Brennan was incarcerated for one of these auto thefts, Hansen continued to mingle with the wrong crowd, and eventually learned of an upcoming criminal opportunity from a Charlestown acquaintance named John Fidler ("Fidler"). On July 25, 1996, Hansen met up with Brennan, who had just been released from jail, and told him that Fidler and two other individuals from Charlestown, Dennis Bird ("Bird") and Billy McKillop ("McKillop"), were planning to rob an armored truck and wanted Hansen to help out by stealing a minivan. (A minivan was the vehicle of choice for such a venture because the sliding doors and removable seats conceal the robbers and allow for easy exit during the heat of a robbery.) According to Brennan, Fidler and his crew were apparently in the process of replacing another Charlestown group that robbed armored trucks while that group was incarcerated for a robbery in Hudson, New Hampshire, which had resulted in the death of two guards.

The next day, Hansen, Fidler, Bird, and McKillop unsuccessfully tried to pilfer a minivan. Having had difficulty

---

[1] The stolen vehicles were primarily used for joy-riding, stripping and selling parts, or to help individuals commit insurance fraud.

stealing these types of vehicles in the past, Hansen asked the more adroit Brennan to lend a hand, with the understanding that both Hansen and Brennan would be compensated for the theft. Brennan understood that the minivan to be stolen was to be used in an armored truck robbery, firearms would be used during the robbery, and he and Hansen would earn more money if the robbery was successful.

On the evening of July 27, 1996, Hansen and Brennan donned nylon pants, long-sleeved shirts, and gloves and trolled the streets of Charlestown for a suitable vehicle. Before long, the pair noticed an attractive white minivan with tinted windows. While Hansen kept watch, Brennan broke into the vehicle and started the engine. After stashing the stolen minivan in Somerville, Massachusetts, Hansen and Brennan showed Fidler and Bird their quarry.

Four days later, on July 31, 1996, a Dunbar armored truck driven by Michael Day ("Day") and Edward Kubera ("Kubera") parked at the Twin City Plaza in Somerville to deliver currency to a Star Market. Kubera unloaded boxes of coins while Day remained in the truck and watched for suspicious activity. While they were working, a white minivan approached the armored truck with tires squealing. An individual dressed in a ski mask and gloves exited the minivan, pointed a handgun at Day's head, and instructed him to lie on the floor of the truck. At the same time, another masked

man wearing gloves and dark clothes approached the armored truck with an assault rifle and brutally shot Kubera in the chest. The second robber climbed over Day to enter the armored truck, collected approximately $3,725, and took Day's firearm. The armed robbers escaped as quickly as they had arrived, with the entire robbery lasting only a few minutes.[2] An hour later, Kubera died.

The resulting investigation produced statements by Brennan explaining Hansen's role in the robbery,[3] as well as a conversation recorded by Brennan's father, Stephen Brennan, in which Hansen admitted that Fidler had asked him to steal a vehicle. Hansen was indicted on June 14, 2001 (nearly five years after the heist), on charges that he (1) aided and abetted robbery affecting commerce, in violation of 18 U.S.C. §§ 2 and 1951(a); (2) conspired to affect commerce by means of robbery, in violation of 18 U.S.C. § 1951(a); (3) used a firearm during a crime of violence and thereby caused murder, in violation of 18 U.S.C. §§ 2, 924(c), and 924(j); and (4) made a false material declaration before a grand

_____

[2] Police found a white minivan near the Twin City Plaza with damage to the door locks and steering column. It belonged to a Boston furniture store and its rear seats had been removed to facilitate moving furniture.

[3] Authorities had recorded Brennan talking about his role in the theft of the minivan and the robbery of the armored truck and arrested him on August 9, 1996. A jury convicted Brennan of aiding and abetting an armored car robbery, conspiring to rob an armored car, and using a firearm during a crime of violence and thereby causing a death. After being sentenced to a 320-month prison term, Brennan agreed to cooperate with authorities and implicated Hansen.

jury, in violation of 18 U.S.C. § 1623. At trial, the Government's case-in-chief was primarily based upon Brennan's testimony, which largely consisted of the factual account set forth above. The jury found Hansen guilty on all counts.

Hansen was sentenced on October 9, 2002. At the sentencing hearing and in a subsequently filed Memorandum dated February 14, 2003, the district court explained its findings. The court grouped Counts 1, 2, and 4 together and determined a base offense level of 43 using the first degree murder guideline. See U.S.S.G. § 2A1.1.[4] The court then departed downward to an offense level of 33 based upon Hansen's state of mind. See U.S.S.G. § 2A1.1 cmt. n.1 ("The extent of the departure should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct."). A two-level enhancement for obstruction of justice was added because Hansen testified falsely before the grand jury, resulting in a total offense level of 35. See U.S.S.G. § 3D1.2(c). Because Hansen had a criminal history category of VI, the district court calculated Hansen's guideline sentencing range to be 292 to 365 months. The court sentenced Hansen to a 352-month term of imprisonment (292 months on counts 1, 2, and 4 — the grouped counts — and a consecutive term of 60 months

---

[4] Guideline citations are to the 2001 Guidelines Manual, which was the version that applied at Hansen's sentencing.

on count 3).  Five years of supervised release and a restitution payment of $3,775 were also imposed.  These appeals followed.[5]

## II. DISCUSSION

Hansen appeals both his conviction and sentence, raising no less than eleven points of error.  We address each challenge in turn, taking the sentencing issue first.

### A.    Booker Sentencing Issue

Hansen's first and main line of attack is the fact that the district court sentenced him under the prior mandatory guideline regime.  See United States v. Booker, 125 S. Ct. 738 (2005).  Despite his claim to the contrary, however, Hansen did not argue to the district court that the guidelines were unconstitutional or that his sentence violated Apprendi v. New Jersey, 530 U.S. 466 (2000); therefore, his Booker claim is not preserved and thus we review for plain error.  See United States v. Antonakopoulos, 399 F.3d 68, 77 (1st Cir. 2005).  Under plain error review, Hansen must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness,

---

[5] Hansen filed a timely notice of appeal on March 3, 2003 which was docketed in this court as No. 03-1331.  Thereafter, Hansen filed a motion for new trial pursuant to Fed. R. Crim. P. 33, which the district court denied on January 25, 2005.  Hansen then filed another notice of appeal on March 7, 2005, which was docketed in this court as No. 05-1414 and consolidated with No. 03-1331.

integrity, or public reputation of judicial proceedings." <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001).

Hansen is able to meet the first two elements because he was sentenced under a mandatory guideline regime. <u>See Antonakopoulos</u>, 399 F.3d at 77. The question is whether he is able to show a reasonable probability "that the sentencing court, freed of the shackles forged by mandatory guidelines, would have fashioned a more favorable sentence." <u>United States</u> v. <u>Guzman</u>, 419 F.3d 27, 32 (1st Cir. 2005). While we have said that we are not "overly demanding as to proof of probability," <u>United States</u> v. <u>Heldeman</u>, 402 F.3d 220, 224 (1st Cir. 2005), the defendant "must point to specific indicia" that reasonable probability exists. <u>United States</u> v. <u>Sanchez-Berrios</u>, 424 F.3d 65, 80 (1st Cir. 2005).

To support his claim that it is reasonably probable that sentencing under a non-mandatory system would have yielded a different result, Hansen points to the following statement in the district judge's February 14, 2003 sentencing memorandum:

> The defendant was 19. The people who enlisted him in stealing the van were at least ten years older, with a brutal reputation in Charlestown. While the law holds Hansen responsible for the foreseeable consequence of his acts, it is clear that his relationship to the armored car robbery that resulted in the tragic murder of Edward Kubera was tenuous. He had, at most, only the most general idea of the plans of Fidler and Bird. He did not know <u>when</u> the robbery would take place, <u>where</u>, or of <u>whom</u>. While Brennan suggests that Hansen knew that guns would be involved - semi-automatic guns at that - Hansen had no control

over how they would be brandished, or indeed, whether they would be used at all.

United States v. Hansen, 256 F. Supp. 2d 65, 72 (D. Mass. 2003). These comments do suggest that the district judge was sympathetic to Hansen's situation in light of the jury's guilty verdict on Count 3, which held Hansen accountable for the shooting as a "foreseeable consequence of the use of a firearm in the course of the conspiracy." See Pinkerton v. United States, 328 U.S. 640, 648 (1946). Scrutinized in the context of the entire memorandum, however, the court's statements do little more than explain why it chose to depart downward to the second degree murder guideline (U.S.S.G. § 2A1.2 (base offense level of 33)) instead of using the first degree murder guideline (U.S.S.G. § 2A1.1 (base offense level of 43)). Nothing in the judge's comments imply that she would have imposed a different sentence had she been operating under an advisory guideline regime. In fact, a review of the entire record indicates just the opposite. The district court explained:

> In this area, the guidelines permit me to make a more nuanced judgment as to what kind of sentence Hansen deserves than the jury did. The jury may have found the killing "foreseeable" but I cannot conclude that it was "intentional." If there ever were a case in which the downward departure to a second degree murder guideline was appropriate, it is this one.

Hansen, 256 F. Supp. 2d at 72. Other comments by the court at the October 9, 2002 sentencing hearing indicate that to the extent the judge felt constrained, it was as a result of the jury's guilty

-9-

verdict on the conspiracy counts, not the mandatory guidelines.[6] Indeed, the judge's comments indicate that she felt the mandatory guidelines allowed her room to craft an appropriate sentence based upon Hansen's actual role and his state of mind. This is critical because here, in contrast to the vast majority of cases, the applicable guidelines encourage the sentencing judge to choose the most appropriate point along a spectrum, from first degree murder (level 43) to second degree murder (level 33)[7] based upon an evaluation of state of mind. The judge exercised this authority by placing the crime at the level she found appropriate (level 33).

But having exercised the authority to depart, the court also made it clear that it would go no lower: "[t]here's no way I'm going to go below a Level 33." It is also clear that the court believed Hansen played a greater role than Brennan in the offenses, and deserved a longer sentence than Brennan's 320 months. As the judge explained:

> Based on the relationship, though, between Mr. Brennan and Mr. Hansen, I agree with the government that I will not give a role adjustment to Mr. Hansen, one that Mr. Brennan got. I do think that, whatever Mr. Brennan might have been involved in in any

---

[6] There, the district court stated, "I don't think that, given what the jury has found, that I have much leeway in the sentence." (emphasis added).

[7] While the guidelines do not explicitly foreclose going below level 33, "the Commission does not envision that departure below that specified in § 2A1.2 (Second Degree Murder) is likely to be appropriate." U.S.S.G. § 2A1.1, cmt. n.1.

other situation certainly, he was a lesser participant in this offense than in others.

While there is certainly some evidence that the court felt sympathetic for Hansen's situation in light of Pinkerton, based upon this record, there can be little doubt but that Hansen falls short of meeting the burden of showing a reasonable probability that the district court would have imposed a more lenient sentence under an advisory guideline regime.

## B. **Crawford v. Washington**

In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the Sixth Amendment's Confrontation Clause prohibits the admission of out-of-court statements that are testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant concerning the statements. Id. at 68. Relying on Crawford, Hansen argues that the district court improperly admitted into evidence the following:

(1) Brennan's testimony concerning his conversation with Hansen, Sheehan, and John Shirko about the need to wear certain clothes when stealing vehicles to be used in robberies;

(2) Brennan's testimony that Robby Brady asked Hansen and Brennan if he could come along with them to steal a car;

(3) Brennan's testimony that Fidler was satisfied with the stolen minivan;

-11-

(4)     Brennan's testimony that Hansen told him that Bird said to "chill out [about the money], there's too much heat around";

(5)     Agent Travaglia's testimony that Stephen Brennan agreed to record a conversation with Hansen; and

(6)     Stephen Brennan's statements made during the recorded conversation with Hansen.

Hansen's reliance on Crawford, however, is misplaced for two reasons.  First, for Crawford to apply, the out-of-court statement must be testimonial in nature.  See Crawford, 541 U.S. at 56.  Although the Supreme Court did not define the term "testimonial," it gave us three examples of statements that would be testimonial: ex-parte in-court testimony (or its equivalent); statements contained in formalized documents (such as affidavits and depositions); and statements made as part of a confession resulting from custodial interrogation.  See id. at 51-52.  In light of these formulations, we find that, with the exception of Stephen Brennan's recorded statements, the challenged statements are nontestimonial because they are either co-conspirator statements made during the course of and in furtherance of the conspiracy, or casual remarks which the declarant would not

-12-

reasonably expect to be available for use at a later trial.[8]  See Horton v. Allen, 370 F.3d 75, 84 (1st Cir. 2004).

The statements of Stephen Brennan are not barred by Crawford because they were not offered for their truth, but to provide context to the recorded conversation.[9]  See Crawford, 541 U.S. at 60 n.9, ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); see also United States v. Jimenez, 419 F.3d 34, 44 (1st Cir. 2005) (finding Crawford inapplicable because "challenged statements were properly admissible, not for their truth, but to provide context"); cf. United States v. Logan, 419 F.3d 172, 178 (2d Cir. 2005) (stating that "the mere fact that the content of [the] statements cast doubt on [a defendant's] innocence does not bring those statements within the ambit of Sixth Amendment protection under Crawford").

Consequently, Hansen's arguments are without merit.

## C.   Jury Instructions

Hansen next argues that the district court erred by failing to instruct the jury about the possibility of multiple

---

[8] Hansen, while making generalized statements of "multi-level hearsay," only raises constitutional Crawford challenges.  Because we find the statements are nontestimonial, for purposes of these appeals, we need not discuss whether the statements constitute inadmissible hearsay.

[9] When an out-of-court statement is not offered to prove the truth of the matter asserted, it is not hearsay under Fed. R. Evid. 801(c).

-13-

conspiracies - that is, a conspiracy to steal the minivan as well as a separate conspiracy to rob the armored truck. The Government retorts that this argument not only is without merit, but has been waived and should not be considered on appeal. We agree that the claim is waived.

An issue is waived when a defendant intentionally relinquishes or abandons a legal right. See United States v. Mitchell, 85 F.3d 800, 807 (1st Cir. 1996). Waiver is distinct from forfeiture, which occurs when a party fails to timely assert a right, in that a forfeited issue is reviewed for plain error while a waived issue generally may not be reviewed. See United States v. Rodriquez, 311 F.3d 435, 437 (1st Cir. 2002).

Hansen, through counsel, not only failed to object to the court's omission of his proposed multiple conspiracy instruction, but also affirmatively stated "I am content" after the district court instructed the jury. We hold that this statement constitutes an explicit withdrawal of the proffered charge on multiple conspiracies, and as such, the issue is waived and may not be revived on appeal. See id. at 437 (finding appellant bound by his express waiver when he deliberately withdrew his objection).

We will pause to note, however, as we pass by this claim, even though it is waived, that the evidence adduced at trial overwhelmingly demonstrated that Hansen knew the minivan would be used in the armored truck robbery, knew that guns would be used in

-14-

the robbery, and expected his payment to depend on the success of the robbery. Accordingly, the district court did not commit plain error as a reasonable jury could not have found more than one illicit agreement or an agreement different than the one charged. See United States v. Balthazard, 360 F.3d 309, 315-16 (1st Cir. 2004) (citing United States v. Bandon, 17 F.3d 409, 449 (1st Cir. 1994)).

### D. Prosecutorial Vouching

Hansen contends that the Government engaged in improper "vouching" in both its opening statement and closing argument. Again, because no objection was raised at trial, we review only for plain error. See United States v. Millan, 230 F.3d 431, 438 (1st Cir. 2000). These arguments need not detain us long.

"A prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by . . . imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted." United States v. Perez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003) (citing United States v. Figueroa-Encarnacion, 343 F.3d 23, 28 (1st Cir. 2003)). In the first challenged remark, the prosecutor told the jury during his opening statement told the jury that Brennan's plea agreement "required him to tell the truth." This statement is not improper, because we have clearly held that "a prosecutor properly may admit

a witness's plea agreement into evidence, discuss the details of the plea during closing arguments, and comment upon a witness's incentive to testify truthfully." United States v. Bey, 188 F.3d 1, 7 (1st Cir. 1999).

Hansen's second challenge is to the closing, where the prosecutor stated:

> The other thing I want to point out, and this is Brendan Brennan's agreement with the government and also what he said on the stand. What did he say on the stand about what his agreement was? He didn't say, 'My agreement is to convict PJ.' He said, 'My agreement is to tell the truth.' He said that over and over again. 'My deal with the government is to tell the truth.' And any benefit [Brennan] gets is based on whether he tells the truth. It's in the agreement, ladies and gentlemen. Go ahead and read it. His deal here is to tell the truth, and I submit to you, that is precisely what he did during this trial.

These remarks were made in rebuttal to Hansen's closing, in which Hansen argued that Brennan's testimony was "bought and paid for" by the Government. In this context, we "typically cede prosecutors some latitude in responding to defense counsel's allegations of fabrication." Perez-Ruiz, 353 F.3d at 10. Latitude or not, the prosecutor's comments do not constitute improper vouching as they do no more than recite facts that are in evidence - that Brennan agreed to testify truthfully as part of his plea agreement - and assert why Brennan should be believed. See Millan, 230 F.3d at 438 n.6 (finding no error where prosecutor stated "I submit to you she is testifying, she has a plea agreement, she has kept that plea

-16-

agreement . . . . She has a plea agreement to testify truthfully . . . . I submit to you, ladies and gentlemen of the jury, you can consider the fact, consider the fact that she has indeed testified truthfully.").

In a similar vein, Hansen urges that the Government improperly referred to stricken testimony during its closing argument - specifically, Brennan's testimony that Hansen stated he (Hansen) would "do the ten years if [he] had to" for his role in the offense. This portion of Brennan's testimony, however, was not stricken by the district court and it was proper for the Government to refer to this evidence in its closing.

As such, Hansen is unable to show plain error regarding the vouching claim.

### E.    Motion For A New Trial

Hansen believes that the district court erred in denying his motion for a new trial because the Government withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). This claim is reviewed for a manifest abuse of discretion. See United States v. Glenn, 389 F.3d 283, 287 (1st Cir. 2004).

The Supreme Court's holding in Brady requires the Government to disclose exculpatory evidence which is "material either to guilt or to punishment." Brady, 373 U.S. at 87. A district court may award a new trial based on newly discovered evidence subject to disclosure under Brady if the defendant

-17-

demonstrates "both that the evidence is material and that there is a 'reasonable probability' that it would produce an acquittal upon retrial." United States v. Wall, 349 F.3d 18, 22 (1st Cir. 2003) (citing United States v. Josleyn, 206 F.3d 144, 151 (1st Cir. 2000)).

The alleged Brady violation in this case involves evidence "that Fidler associated with three separate 'crews' who frequently changed plans and stole cars on the way to various robberies." The import of this evidence, according to Hansen, is that Fidler always acted spontaneously and with different groups of people; thus, it allegedly shows that Hansen could not have "reasonably foreseen" that Fidler would use the stolen minivan to rob an armored truck.

It is not enough for Hansen to show "the mere possibility that an item of undisclosed information might have helped [his] defense, or might have affected the outcome of the trial." United States v. Garcia-Torres, 341 F.3d 61, 70 (1st Cir 2003) (internal quotation marks and citations omitted). Instead, Hansen must show the evidence to be of such probative value that there is a reasonable probability it would produce a different result. See id. Hansen's attempt to meet this burden falls far short. First, the relevancy of Fidler's erratic behavior in 1998 is, at best, unclear, because it involved armored truck robberies that occurred nearly two years after the robbery at issue here. Second, the

-18-

evidence is hardly exculpatory – if anything, it seems to reinforce the notion that Fidler was a consummate gun-toting robber who was highly likely to use stolen vehicles to accomplish his criminal goals. For these reasons, we find no abuse of discretion in the district court's denial of the new trial motion.

Bundled with Hansen's Brady challenge is a general claim of ineffective assistance of counsel. Even if it were sufficiently fact-specific (which it is not), "we have held with a regularity bordering on the monotonous that . . . claims of ineffective assistance [of counsel] cannot make their debut on direct review" but should be presented to the district court pursuant to 28 U.S.C. § 2255. United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993).

## F. Pinkerton v. United States

As we discussed in connection with the Booker challenge, the district court gave the jury a Pinkerton instruction that allowed the jury to find that Hansen, by virtue of his membership in the charged conspiracy, was criminally liable for the substantive offenses committed by his co-conspirators during the course of and in furtherance of the conspiracy. See Pinkerton, 328 U.S. at 645-48. Hansen attacks his conviction under Pinkerton, arguing (1) he was not afforded adequate notice of the essential nature of the charges against him; (2) the evidence does not support a finding that Fidler's use of a firearm to commit armed

robbery was reasonably foreseeable to Hansen; and (3) the district court's wording of the Pinkerton instruction was improper.

As to notice, the indictment told Hansen that he was being charged in Counts 1-3 for aiding and abetting robbery affecting commerce, conspiring to affect commerce by robbery, and using a firearm during a crime of violence and thereby causing murder. The unambiguous language of the indictment, combined with our decisions which have made abundantly clear that a co-conspirator is liable for acts committed by other members in furtherance of the conspiracy, see, e.g., United States v. Sanchez, 917 F.2d 607, 612 (1st Cir. 1990), convince us that Hansen, represented by experienced defense counsel, suffered no unfair surprise.

Nor is Hansen able to persuasively challenge the sufficiency of the evidence that was presented against him. The Government's case relied primarily on the damaging testimony of Hansen's childhood friend, Brennan. We previously described their friendship as unfortunate, and undoubtedly it was - their combined actions resulted in a tragic loss of life and countless other offenses. Their partnership was particularly unfortunate for Hansen, because, as the district court observed, "[w]ithout Brennan, there was no case." Hansen, 256 F. Supp. 2d at 69. Brennan's testimony revealed not only that Hansen was aware of the possibility that the minivan might be used in an armed robbery, but

that Fidler told him the minivan was needed for an armored car robbery and guns would be used during the robbery. Moreover, Brennan and Hansen discussed how armored car robberies often resulted in killings, and knew their payment was contingent on the success of the heist. Under de novo review and taken in the light most favorable to the jury's guilty verdict, see United States v. Felton, 417 F.3d 97, 104 (1st Cir. 2005), Hansen's challenge to the sufficiency of the evidence is simply unavailing.

Because there was sufficient evidence to allow the jury to conclude, beyond a reasonable doubt, that Hansen and others were members of the same underlying conspiracy, the Pinkerton charge to the jury was proper. See United States v. Torres, 162 F.3d 6, 10 (1st Cir. 1998). We, thus, "are not confronted with the sort of 'marginal case' in which the Pinkerton instruction sometimes causes concern." Sanchez, 917 F.2d at 612 n.4 (citation omitted). Additionally, after review of the district court's charge, we find it contains all elements of a standard Pinkerton instruction, including emphasis that the jury was obligated to find each element of Pinkerton beyond a reasonable doubt.

### G. Double Jeopardy

Hansen contends that his indictment and conviction for violations of 18 U.S.C. §§ 924(c) and (j), and the underlying violent crimes pursuant to 18 U.S.C. § 1951, violate the Double Jeopardy Clause of the Fifth Amendment because these counts involve

the same criminal conduct.  We review for plain error because this argument was not raised below.  See United States v. Winter, 70 F.3d 655, 666 (1st Cir. 1995).

If this issue had been raised prior to 1995, Hansen's contention may have been viewed as novel.  But by now, this argument is old hat, and borders on frivolous.  We have repeatedly held "that Congress intended § 924(c)'s firearm violation 'to serve as a cumulative punishment in addition to that provided for the underlying violent crime' and that the Double Jeopardy Clause was therefore not offended."  United States v. Gonzalez-Arimont, 268 F.3d 8, 13 (1st Cir. 2001) (citing United States v. Centano-Torres, 50 F.3d 84, 85 (1st Cir. 1995)); see also United States v. Battle, 289 F.3d 661, 669 (10th Cir. 2002) (finding no double jeopardy violation for convictions under 18 U.S.C. §§ 1951 and 924(c) and (j)).

## H.  Suppression Arguments

Next, Hansen argues that based upon the Fifth and Sixth Amendments, the district court should have suppressed inculpatory evidence, including Hansen's grand jury testimony and the tape recorded conversation with Stephan Brennan.  The Government is quick to point out that these arguments are waived as Hansen never moved to suppress this evidence on Fifth and Sixth Amendment grounds, nor did he object to its admission on that basis.

-22-

Federal Rule of Criminal Procedure 12(b)(3) requires defendants to file suppression motions prior to trial, and failure to do so constitutes express waiver. See Fed. R. Crim. P. 12(b)(3) and (h). We interpret the mandatory language of Rule 12 broadly to include waiver when a defendant fails to file a motion to suppress before trial, and have even extended waiver to a situation where a suppression motion was filed, but the defendant did not include a particular ground and wished to add it later. See United States v. Santos Batista, 239 F.3d 16, 20 (1st Cir. 2001); United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998).

This case does not fall at the outer bounds of our waiver decisions. Rather, it presents squarely a situation where a defendant has failed altogether to file a motion to suppress below, and as such, we will not consider Hansen's suppression arguments on appeal. See Santos Batista, 239 F.3d at 19-20.

## I.   Leading Questions

Hansen contends that his due process rights were violated by the Government's use of leading questions during its direct examination of Brennan. The Rules of Evidence provide that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Fed. R. Evid. 611(c). "The evil of leading a friendly witness is that the information conveyed in the questions may supply a false memory." United States v. McGovern, 499 F.2d 1140,

1142 (1st Cir. 1974) (internal quotation marks and citations omitted). There is, of course, a degree of tolerance for leading questions under certain circumstances. Because it is so case-specific, "the trial judge is best situated to strike a practical and fair balance" and is afforded "extensive discretion over the phrasing of questions." Id.

As proof that the entire trial was unfair, Hansen references two transcript pages, suggesting they contain "examples" of the Government's abuse. After reviewing this portion of the transcript, we note that trial counsel did not object to questions as leading and, therefore, review is for plain error. Clearly, there is no plain error; the questions simply do not cross the "fine line between stimulating an accurate memory and implanting a false one." Id.

The Government's questions were used primarily to develop coherent testimony from Brennan. This was especially important here because, based upon Hansen and Brennan's long criminal history together, there was a risk of eliciting highly prejudicial (and ultimately irrelevant) information from Brennan.[10] Moreover, we note that defense counsel engaged in a thorough cross-examination of Brennan, which enabled the jury to assess appropriately

---

[10] This could also explain why defense counsel chose not to object to some of the leading questions. See Matthews v. Rakiey, 54 F.3d 908, 929 (1st Cir. 1995) (failing to object to leading questions "is generally considered a tactical decision").

-24-

Brennan's testimony.  See United States v. Noone, 913 F.2d 20, 37 (1st Cir. 1990) (considering defense counsel's thorough cross-examination in deciding that no prejudicial error occurred from use of a leading question).  Thus, reversal is not warranted.

Hansen's argument also alludes to leading questions outside of his general examples.  We decline the invitation to mind read, however, and instead find that such claim of error is inadequately developed on appeal.  See United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997) (stating that issues are waived when "raised on appeal in a perfunctory manner, not accompanied by developed argumentation").  Even so, in the majority of instances, no objection was made below and were we to review, it would again be for plain error - an insurmountable hurdle considering Hansen has made little, if any, effort to show that such error likely affected the outcome below.

## J.   Juror Note

Hansen claims that he was denied a fair trial because during trial the jury expressed general concerns about privacy. Once again, the piers of Hansen's argument are undermined by waiver.

On May 23, 2002, the court received the following note from juror number two:

> The jury in general was concerned about safety
> in regard to our names having been used on
> Monday in front of the defendant and also,

> just in general we'd just like affirmation
> that no witnesses, etc. will know our names.

Initially, defense counsel broached the idea of excusing this juror because counsel was concerned that the expression of fear showed that she had prejudged Hansen.  Defense counsel elaborated:  "If it's just a general feeling that the jurors have, fine, that may well be cured by an instruction."  The court agreed and proposed a curative instruction to the attorneys, to which defense counsel responded, "Something along those lines, Judge, fine."

The court, along with counsel, met with juror number two, and learned that, in fact, the general concerns expressed in the note were those of the jury as a whole, and had blossomed prior to the start of evidence (and, therefore, had no specific reference to Hansen or his activities).  This conversation apparently appeased Hansen's attorney, who withdrew his objection to juror number two by stating, "Given the young lady's remarks, your Honor, I think an instruction from you will be curative at this point."  The court then gave an instruction to the jury which was substantially similar to the proposed instruction previously agreed to.  The defense interposed no objection to this instruction.

Based on this record, it is clear that trial counsel diligently raised potential juror issues with the district court.  We decline, however, to revisit them on appeal because counsel affirmatively withdrew any objections to juror number two, and specifically agreed to the court's curative instruction.  See,

-26-

e.g., <u>Rodriquez</u>, 311 F.3d at 437.  Nonetheless, we believe that the district court, utilizing its considerable discretion in fashioning curative instructions, took appropriate measures to maintain the integrity of Hansen's right to a fair trial.

### K.    Inconsistent Theories

As his final claim of error, Hansen argues that the Government presented factually inconsistent theories during its prosecutions of Hansen and Brennan.  Based upon the record before us, we disagree.  Hansen seems to take issue with the fact that during Brennan's case, the Government concentrated on Brennan's role in the offenses, and vice versa in Hansen's case.  There is nothing inconsistent about this approach.  In fact, in both instances the Government theorized the existence of a conspiracy to steal a minivan for use in an armed robbery.  The Government eventually learned that the minivan theft resulted from the concerted efforts of Hansen and Brennan on the night of July 27, 1996.  Of course, the full extent of Hansen's involvement was unearthed after Brennan's conviction, so it is not surprising that the Government's theory at Hansen's trial had a slightly different gloss.

Accordingly, we find Hansen's last challenge to be wholly without merit.[11]

<u>Affirmed.</u>

---

[11] We need not discuss, therefore, the applicability of <u>United States</u> v. <u>Weems</u>, 322 F.3d 18, 24 (1st Cir. 2003) (finding "no risk to defendants' rights when two different juries are involved").