# United States Court of Appeals
## For the First Circuit

No. 06-2426

UNITED STATES OF AMERICA,

Appellee,

v.

IOAN EMIL CODARCEA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Oberdorfer,* Senior District Judge.

Michael J. Iacopino, by appointment of the Court, with whom
Jaye L. Rancourt and Brennan Caron Lenehan & Iacopino were on brief
for appellant.
    Aixa Maldonado-Quiñones, Assistant United States Attorney,
with whom Thomas P. Colantuono, United States Attorney, was on
brief for appellee.

October 29, 2007

*Of the District of Columbia, sitting by designation.

**STAHL**, <u>**Senior Circuit Judge**</u>.  Defendant-Appellant Ioan Emil Codarcea was convicted of bank fraud, conspiracy to commit bank fraud, and aggravated identity theft for his role in a spate of unauthorized ATM withdrawals targeting Bank of America (the "Bank")[1] during three separate time periods from 2003 to 2005.  Codarcea was sentenced to seventy months' imprisonment and ordered to pay $363,266.59, a sum equivalent to the total loss suffered by the Bank as a result of the fraudulent banking activity across all three periods.  Codarcea appeals his sentence, arguing that the total loss was not reasonably foreseeable to him and that therefore the district court erred in attributing the total amount of the loss to him in its calculation of his sentence.  Finding Codarcea's argument meritless, we affirm the sentence.

## I.  Background

During three separate periods of time from 2003 to 2005,[1] Codarcea and his co-conspirators used devices temporarily installed at various ATMs in Massachusetts and New Hampshire to steal personal banking information from numerous customers of the Bank, enabling the creation of counterfeit ATM cards.  The counterfeit

---

[1]The first period spanned from March 2003 to May 2003 in the Greater Boston area, the second period from December 2004 to January 2005 in Revere, Saugus, and Medford, Massachusetts, and the third period occurred in March 2005 in the vicinity of Manchester, New Hampshire.

cards were used, in turn, to make unauthorized withdrawals from the targeted bank accounts.

The government produced direct evidence tying Codarcea to the first and third periods of fraudulent banking activity. The evidence included bank surveillance photographs depicting Codarcea tampering with certain of the compromised ATMs at or around the time that account information was stolen and conducting unauthorized transactions with counterfeit ATM cards. The government also presented evidence that during the first period of fraudulent transactions in 2003, Codarcea stayed at a Marriott's Residence Inn in Woburn, MA, with at least three other people. A hotel employee made a photocopy of Codarcea's Canadian driver's license when he checked in, noting that he paid for the room in cash. During this time, one of the other guests in the room, an individual identified as Gheorghe Tolontan, paid $6,000 in $20 bills to purchase stereo equipment from a nearby store. Codarcea checked out of the hotel abruptly on May 6, 2003, after a local news station aired a story about the fraudulent banking activity, including bank surveillance photographs of Codarcea and Tolontan.

While the government did not have direct evidence of Codarcea's involvement in the second period of fraudulent transactions, it did present circumstantial evidence linking all three periods together and argued that all three periods were part of one overarching conspiracy. The second period of unauthorized

banking activity occurred between the first and third periods, in the same region of the country, and was executed with a very similar modus operandi. Additionally, photographic evidence credited by the district court established that at least one individual (although not the defendant) involved in the fraudulent third period transactions was involved in at least one of the fraudulent second period transactions.

Codarcea was arrested on April 24, 2005 after making an illegal border crossing from Canada into Vermont. He had in his possession a Canadian driver's license with a number matching that of the license photocopied by the Marriot hotel in 2003. Codarcea was detained by the immigration authorities, pled guilty to entering the United States illegally, and was sentenced to time served. On May 11, 2005, a grand jury returned an indictment charging Codarcea with bank fraud and conspiracy to commit bank fraud, and a warrant for Codarcea's arrest on those charges was issued that same day. On February 13, 2006, after the issuance of two superseding indictments, an amended redacted indictment was filed, charging Codarcea with (1) conspiracy to commit bank fraud, in violation of 18 U.S.C §§ 371 and 1344; (2) bank fraud, in violation of 18 U.S.C. § 1344; and (3-5) aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). Codarcea was tried and convicted on all counts.

Codarcea's Presentence Investigation Report ("PSR") assigned him a base offense level of 7. After relevant enhancements were calculated, Codarcea's total offense level was 21.[2] Combined with a criminal history category of I, the applicable Guidelines range was 37-46 months' imprisonment for Counts One and Two. For the aggravated identity theft Counts Three through Five, 18 U.S.C. § 1028A(b)(4) imposes a mandatory minimum sentence of two years, which may run concurrently for each count charged under the statute but must run consecutively to any other sentence imposed. Seeing no reason to depart from the Guidelines, the sentencing judge adopted the PSR's recommendations and sentenced Codarcea to a term of 46 months for Counts One and Two, to run concurrently, followed by 24 months for Counts Three through Five, to run concurrently, for a total of 70 months' imprisonment.

## II. Discussion

Codarcea timely objected to the loss calculation in the PSR and renewed his objection at his sentencing hearing. The crux of his objection is that the district court erred in finding him responsible for the total loss of $363,266.59 suffered by the Bank

---

[2]The PSR recommended a twelve-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G) because the offenses involved a loss in excess of $200,000 (but not more than $400,000) and a two-level enhancement under U.S.S.G. § 2B1.1(b)(9) because the offenses involved the use of sophisticated means. There was no recommended increase for the number of victims because, although hundreds of individual accounts were targeted, the only victim that suffered an actual loss was the Bank.

across all three periods of fraudulent activity, which resulted in the twelve-level sentence enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G). We review a district court's interpretation and application of the federal Sentencing Guidelines *de novo*, United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005), but review the court's related factual findings, including its calculation of the total loss amount, for clear error. See United States v. Alli, 444 F.3d 34, 37-39 (1st Cir. 2006).

Section 2B1.1(b)(1) calls for a sentencing court to increase an offender's offense level in theft and fraud cases according to the amount of loss resulting from the offense. A defendant in a jointly undertaken criminal activity is liable for the loss resulting from acts directly attributable to him and for the loss resulting from the reasonably foreseeable acts of others taken in furtherance of the jointly undertaken criminal activity. See U.S.S.G. § 1B1.3(a)(1), (3); United States v. Pizarro-Berrios, 448 F.3d 1, 6 (1st Cir. 2006).

Codarcea argues on appeal that the government established neither the parameters of the conspiracy for which he was convicted nor his role in that conspiracy. He reasons that without that information, the court cannot extrapolate that the losses resulting from the transactions in which he was not shown to be directly involved, either by compromising an ATM to steal customer account data or using the stolen data to conduct unauthorized withdrawals,

are attributable to him. Codarcea maintains that he can therefore only be held accountable for the losses that resulted from the fraudulent transactions to which the government linked him by direct evidence.[3]

It is true that "in cases involving a jointly undertaken criminal activity, a district court must make an individualized determination regarding the amount of loss attributable to, or reasonably foreseeable by, a defendant, and may not rely solely on what was charged in the jointly undertaken criminal activity count of an indictment." Pizarro-Berrios, 448 F.3d at 7. Far from relying merely on the charges in the indictment, however, at Codarcea's sentencing hearing the district court carefully scrutinized the evidence and delivered a lengthy and well-reasoned analysis determining that it was more likely than not that the total loss across all three periods was the result of one overarching conspiracy, that Codarcea was involved in multiple aspects of the conspiracy throughout its duration, and that therefore the total loss was reasonably foreseeable to Codarcea.

We see no clear error in the district court's analysis. In order to establish foreseeability, the sentencing court must first "determine what acts and omissions of others were in

---

[3]Codarcea calculates this amount to equal $99,736.00, which would result in an eight-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(E), as opposed to the twelve-level increase imposed by the district court.

furtherance of the defendant's jointly undertaken criminal activity. This task requires the court to ascertain what activity fell within the scope of the specific conduct and objectives embraced by the defendant's agreement." United States v. LaCroix, 28 F.3d 223, 227 (1st Cir. 1994). The court must then "determine to what extent others' acts and omissions . . . would have been foreseeable by a reasonable person in defendant's shoes at the time of his or her agreement." Id. However, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3, cmt. n.2; Pizarro-Berrios, 448 F.3d at 8.

Codarcea was heavily involved in the scheme to defraud the Bank by conducting unauthorized ATM withdrawals and does not dispute that close to $100,000 of the total loss could be attributed to him directly as a result of his own unlawful actions. The remainder of the loss occurred during the same time period, in the same area, and from ATMs compromised in the same manner as those compromised by Codarcea. Given the evidence that the three periods of fraudulent banking activity constituted one single conspiracy, that Codarcea was involved in the conspiracy at the beginning and at the end with no indication that he withdrew at any time, and that he was linked to other individuals who were engaged in identical fraudulent transactions, it is clearly more likely than not that all of the fraudulent activity underlying the Bank's

-8-

total loss of $363,266.59 consisted of acts taken in furtherance of an unauthorized ATM withdrawal scheme hatched by defendant and his co-conspirators. Thus the district court did not err in finding it reasonably foreseeable that "the fruits of [Codarcea's] efforts to obtain ATM numbers for the purpose of exploiting them for fraudulent purposes" would produce the total amount of losses that the Bank in fact suffered, "even if some of those numbers were acquired on different dates from the date when he was tied to the ATM that was exploited."

### III. Conclusion

For the reasons stated above, the defendant's sentence is AFFIRMED.