# United States Court of Appeals
# For the First Circuit

No. 19-1780

UNITED STATES,

Appellee,

v.

FRANCISCO OSCAR GRULLON, a/k/a Frank,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Andrew S. Dulberg, with whom Russell Spivak, Felicia H.
Ellsworth, and Wilmer Cutler Pickering Hale and Dorr LLP were on
brief, for appellant.
Elysa Q. Wan, Assistant United States Attorney, with whom
Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

April 27, 2021

THOMPSON, Circuit Judge. Francisco Oscar Grullon is one of at least several coconspirators the government has prosecuted for participating in a massive scheme to defraud the federal government by falsifying tax returns.[1] Once arrested, Grullon faced charges commensurate with his coconspirators, some of whom had already pleaded guilty or had been convicted. Grullon proceeded to trial where a jury convicted him of multiple counts. Now, he appeals several evidentiary rulings by the district court as well as the district court's application of two sentencing enhancements. Discovering no errors, we affirm.

## Background

## The Scheme

Beginning in October 2011, Grullon, a native of the Dominican Republic who immigrated to the United States when he was nine, conspired with a Massachusetts lawyer named David Cohen and others to defraud the United States. The conspiracy, labeled a Stolen Identity Refund Fraud scheme by IRS agents, was relatively simple. In the first step, coconspirators stole personal identification information, such as social security numbers, names, and birthdates. With the stolen data in hand, other

---

[1] For details about another coconspirator (who is not relevant to this appeal), see generally United States v. Flete-Garcia, 925 F.3d 17 (1st Cir. 2019).

conspirators executed the second stage, using the information to file fraudulent tax returns such that the IRS sent refund checks to addresses in Massachusetts.[2]

With checks in hand, the third stage began. And this is where Grullon and Cohen became useful by laundering the checks into cold hard cash through bank accounts at various banks in Massachusetts.[3] The government put forward circumstantial evidence that, starting in October 2011, Cohen and Grullon conspired to deposit some of the checks into Cohen's Interest on Lawyers Trust Accounts, known as IOLTAs, which are accounts that lawyers arrange to hold onto their clients' funds. See Mass. R. Prof. C. 1.15(e). To suspicious tellers, Cohen insisted the money came from his legal clients, but bank employees observed Cohen writing himself checks from the IOLTA account into which he had just deposited the alleged client funds. The checks' amounts approximated what he had just put into the bank.

---

[2] The scheme primarily targeted people in Puerto Rico because the IRS does not require the Commonwealth's residents to file yearly tax returns. Because fewer Puerto Rico citizens file returns, the conspirators expected the IRS would flag fewer of their fraudulent returns as suspicious given the lesser chance the IRS would have multiple returns with the same personal identification information.

[3] The banks included Century Bank, Brookline Bank, Citizens Bank, Bank of America, and People's United Bank.

Other times, Cohen established accounts in the name of Grullon's business, American Dominican Professional Association, Inc. ("AD Professional") (Grullon only once went with Cohen to open an account and even then he kept his name off of the account).[4] AD Professional purported to be a legitimate business, and indeed it sometimes operated a function hall. When Cohen opened the AD Professional accounts, he variously claimed the business was a commercial real estate company or a check-cashing company.

For one AD Professional account, Cohen told bank employees that Grullon had the necessary check-cashing license from the Commonwealth of Massachusetts to operate a check-cashing business. If he were telling the truth, the pair could have deposited the fraudulent third-party tax refund checks with less scrutiny from the bank because the nature of a check-cashing business is to take checks from third parties. Grullon also later told one bank teller that he had a check-cashing license that allowed him to deposit the third-party tax refund checks (he did not). When the license never materialized, the bank closed the account because of the suspicious check-cashing activity.

Cohen alternatively claimed that the third-party tax refund checks came from AD Professional. In this telling, Cohen

---

[4] The business also went by variations of the name AD Professional Association, Inc., but we will refer to it as AD Professional for clarity.

deposited tax refund checks for members of the association into the AD Professional accounts to hold onto the money for future real estate or land purchases the association might want to make. When a bank asked for a signed contract to verify the arrangement -- the IRS had issued reclamation notices to the bank for some of the tax refund checks Cohen had deposited[5] -- Cohen could not produce one. The bank thereafter closed the account based on the suspicious check-cashing activity.

Sometimes banks hesitated before opening accounts in the name of AD Professional. Wanting to ensure the AD Professional accounts were legitimate, employees from a couple of the banks independently investigated the company's listed address and found a nearly empty building with some sort of function space on the second floor, and very little resembling either the check-cashing or real estate businesses Cohen purported it to be. The banks thereafter either refused to open AD Professional accounts or closed ones they had opened before looking into the company.

Although eyewitness testimony and security camera footage only placed Grullon in one of the target banks in January 2013 at the earliest, bank employees at some of those banks testified to Grullon thereafter depositing multiple fraudulent tax

---

[5] A reclamation notice from the IRS occurs when the payee of a tax refund check alleges that she did not receive the benefit of that check. The IRS then seeks to reclaim the funds from the bank that processed the check.

return checks into the AD Professional and IOLTA accounts multiple times a week (Grullon, though not a signatory on the accounts, could still deposit checks). The jury also heard about bank tellers confronting Grullon regarding the validity of the third-party checks he was depositing, which Grullon sometimes claimed he was handling for friends. At least one bank official examined the checks and noticed that many of Grullon's "friends" happened to live at the same address.

Additionally, Cohen's officemate, a fellow lawyer who had known Cohen for around 40 years, testified to having met Grullon about five times when Grullon showed up at the office to discuss business ventures he and Cohen were arranging. The officemate recounted several heated conversations between Grullon and Cohen about whether they were setting up too many accounts and depositing too many checks too quickly, especially because Grullon had not yet received the check-cashing license he had promised to obtain.

As for direct evidence of Grullon's involvement, the prosecution enlisted one of his coconspirators, Dubin Eduardo Gonzalez-Pabon, as their star witness. In early 2013, Cohen recruited Gonzalez-Pabon, an attorney from Venezuela and a friend of Cohen's girlfriend (she and Cohen even attended Gonzalez-Pabon's wedding), to participate in the conspiracy. Gonzalez-Pabon lived at and worked from Cohen's house.

According to Gonzalez-Pabon, Grullon instructed the new coconspirator to become a treasurer and secretary of AD Professional, purportedly to help the company with investments. On the day Gonzalez-Pabon signed the paperwork to officially join the company in those roles, Grullon and Cohen directed him to open multiple accounts at multiple banks in the name of AD Professional, and to deposit checks into those accounts. Gonzalez-Pabon complied. Grullon gave Gonzalez-Pabon the majority of checks he was to deposit. Grullon also provided Gonzalez-Pabon money to deliver to the unknown coconspirators who procured the fraudulent refund checks for the scheme. At some point later in 2013, a bank official confronted Gonzalez-Pabon about the third-party checks he was depositing into the AD Professional accounts, telling Gonzalez-Pabon that the checks were made out to "fictitious people." Grullon and Cohen thereafter told Gonzalez-Pabon to close the accounts. A jury could easily have found they did so because the duo knew the checks were fraudulent and because they worried the IRS would reclaim the money they had deposited now that the bank had discovered the scam.

The conspiracy lasted until December 2014, but Grullon stopped participating in November 2013 when he fled to the Dominican Republic, allegedly to begin a fruit and vegetable export business. Between October 2011 and November 2013, the trio defrauded the U.S. Government of at least $1,604,000.28 across

five banks in Massachusetts using 246 fraudulent checks, cashing around $400,000 in October 2013 alone.

## The Investigation

Grullon's departure was not necessarily coincidental. After banks voiced suspicions about Grullon and Cohen depositing United States Treasury checks in other people's names and after the IRS issued a number of reclamation notices to those banks, the IRS's Criminal Investigations Division began investigating the conspiracy in July 2013. Special agents Ryan J. Talbot and James Clarke conducted most of the on-the-ground investigation, gathering evidence from the banks and interviewing witnesses. Towards the end of 2014, Gonzalez-Pabon was arrested and almost immediately began to cooperate. He participated in three interviews, the first of which the special agents recorded. In the latter two, at which special agent Clarke took notes, Gonzalez-Pabon contradicted earlier statements. He had initially admitted to knowing the scheme was criminal when he deposited the checks, but in the subsequent interviews Gonzalez-Pabon claimed he found out about the illegality only upon his arrest.

On May 5, 2015, a federal grand jury indicted Grullon and Cohen, charging them with conspiracy to commit "theft, conversion, or embezzlement of government property" starting in October 2011 (18 U.S.C. § 371), with seventeen counts of conversion of government property (18 U.S.C. § 641), and with one count of

- 8 -

conspiracy to commit money laundering starting in October 2011 (18 U.S.C. § 1956(h)).[6]  Grullon was apprehended in the Dominican Republic on March 20, 2018, and extradited to the United States in June.

**Events Before Grullon's Trial**

In between Grullon's indictment and his arrest, several events germane to his appeal occurred.  First, by the time Grullon unwillingly returned to the United States, the government had already successfully tried Cohen and convicted him.  For his role in the crimes, Cohen received fifty-four months imprisonment, with three years of supervised release, and a restitution order for $1,672,958.74.

Second, special agent Clarke got into his own hot water. A grand jury indicted him on March 7, 2018, for sexually assaulting an intern on July 26, 2017.[7]  A jury eventually convicted Clarke (he received 7 to 8 years), but at the time of Grullon's trial, the government (wisely) decided not to call Clarke to testify.

---

[6]  Gonzalez-Pabon was also indicted, but he pled guilty to one count of conspiracy under 18 U.S.C. § 371.  He received 12 months and 1-day imprisonment with 2 years of supervised release and he was ordered to pay $780,682.54 in restitution.

[7]  Clarke had taken the intern to a bar after work and then offered her a ride to the bus station.  Once in the car, he handcuffed her, shoved his gun in her mouth, and digitally raped her.

**Grullon's Trial & Sentencing**

Prior to trial, Grullon submitted several motions. First, Grullon filed a motion in limine seeking to introduce evidence concerning Clarke's criminal behavior pursuant to Federal Rule of Evidence 404(b)(2), which permits certain evidence of a person's prior bad actions to be introduced for specific purposes.[8] Second, Grullon filed a motion for discovery because he wanted the government to provide him with Gonzalez-Pabon's unredacted presentence report (PSR) so that he could uncover additional evidence to impeach the credibility of the government's star witness. Such reports are generally unavailable to third parties and contain information about a defendant's personal life that helps the judge figure out an appropriate sentence.[9] Both the government and Grullon agree Grullon had already been provided with Gonzalez-Pabon's redacted PSR.

The trial judge (who was the same judge who had tried and sentenced Cohen) denied the first motion without prejudice, meaning Grullon could raise the point again during trial. As for

---

[8] Motions in limine are a tool for trial lawyers to petition the court to exclude or to include particular pieces of evidence. Judges request them before the trial begins so that thorny evidentiary questions do not interrupt or slow down the proceedings. See United States v. Agosto-Vega, 731 F.3d 62, 65 (1st Cir. 2013).

[9] See In re Bos. Herald, Inc., 321 F.3d 174, 188 (1st Cir. 2003).

the second, he took the PSR question under advisement, indicating he would conduct an in camera inspection. But he never issued a final ruling about it. We will save the details for further along, but keep the motions in mind because they are central to some of Grullon's appellate issues.

After a six-day trial concluded on April 29, 2019, a jury convicted Grullon of conspiracy to commit the various financial crimes, of conspiracy to commit money laundering, and of fifteen counts of converting government property.[10]

The judge sentenced Grullon to 84 months in jail based on a total offense level (TOL) of 28, plus 3 years of supervised release, and $1,604,000.28 in restitution.[11] Relevant here, the TOL calculation included a 2-level enhancement for Grullon's leadership role (U.S.S.G. § 3B1.1(c)), and a 16-level enhancement because the amount of loss was greater than $1.5 million (U.S.S.G. § 2B1.1(b)(1)(I)).[12] Grullon objected to both enhancements at trial for reasons we recount later.

---

[10] The government, mid-trial, moved to dismiss two of the conversion counts from the original indictment.

[11] Federal judges use the United States Sentencing Guidelines, which has a complex system of offense levels, when calculating the appropriate punishment for defendants. See generally United States v. Booker, 543 U.S. 220 (2005).

[12] Grullon's TOL started from a base level of 6. From there, the judge tacked on a 2-level enhancement because the offense involved ten or more victims (U.S.S.G. § 2B1.1(b)(2)(A)), and a 2-

Grullon timely appealed his conviction and here we are.

**Discussion**

On appeal, Grullon advocates for three errors.  First, he contends the judge mistakenly excluded the evidence concerning special agent Clarke's criminal behavior.  Second, Grullon asserts the judge erred by denying him the opportunity to obtain the unredacted PSR and by failing to enter a final ruling on the matter.  Third, Grullon challenges the appropriateness of the sentencing enhancements.  Because the first set of claims relate to evidentiary questions, we will review those together before turning to the sentencing enhancements.

## I.  Evidentiary Exclusions

### A.  Standard of Review

Generally, we review preserved evidentiary rulings for an abuse of discretion.  See United States v. Jimenez, 507 F.3d 13, 16 (1st Cir. 2007); United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006).  However, the government contends Grullon did not preserve the arguments because he either waived or forfeited them; the former would preclude our review while the latter would invite

---

level enhancement thanks to the conviction for conspiracy to commit money laundering (U.S.S.G. § 2S1.1(b)(2)(B)).  Grullon does not challenge these enhancements.

our more skeptical plain error stare.[13]  See Hansen, 434 F.3d at 101.  "Forfeiture is the failure to make the timely assertion of a right, [whereas] waiver is the 'intentional relinquishment or abandonment of a known right.'"  United States v. Olano, 507 U.S. 725, 733 (1993) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).  Therefore, before tackling Grullon's evidentiary claims, we will decide for each claim what got preserved and what didn't.

## B.  Exclusion of the special agent's unrelated crime

To determine whether Grullon preserved his right to appeal the judge's denial of his motion in limine regarding the admissibility of Clarke's malfeasance, we need to explain what happened at the final pretrial conference when the judge made an initial ruling.

Grullon sought to admit the incriminating evidence in order to bolster his defense that the government's investigation was untrustworthy because Clarke, a sexual transgressor, was "instrumental to the investigation," especially given his "apparent role as case scribe" for the interviews of Gonzalez-Pabon.  Specifically, Grullon contended the evidence was "probative of Clarke's willingness to lie to accomplish his ends,

---

[13]  To establish plain error, Grullon must show (1) an error (2) that is clear, (3) that affected his substantial rights, and (4) that seriously undermined the fairness, integrity, or public perception of his trial.  See United States v. Takesian, 945 F.3d 553, 563 (1st Cir. 2019).

and to abuse his power to subvert justice" and it was "probative evidence that [] Clarke acted improperly while leading the investigation" because a person "does not change overnight from an honorable IRS agent dispassionately investigating tax crimes to raping office interns at gunpoint in [his] IRS-issued car." The government filed its own motion to exclude, arguing Clarke had a "minimal" role in the investigation because he "was not an affiant on any warrants or complaints, nor did [he] testify in the grand jury," and, moreover, Clarke did not draft "reports of [witness] interviews." Therefore, it argued his testimony was not germane.

The judge preliminarily excluded the evidence of Clarke's dreadful crime, concluding it would have no relevance to the trial. However, and importantly, the judge denied Grullon's motion without prejudice, twice telling Grullon that he could renew his attempt to introduce the evidence at trial if he ever believed the trial's development made Clarke's behavior relevant. The judge articulated that if Grullon "at any point [in the trial wanted] to bring [Clarke] up, [he could], outside the presence of the jury," and that, even though his "preliminary view [was] that I don't see any basis" for the evidence, he would "hear [Grullon] . . . based on the evidence at trial, and [he could] press it then, if [he] wish[ed]." (Emphasis added.) Grullon's attorney affirmed that he understood the ruling.

As the trial unfolded, Grullon never availed himself of the opportunity to bring the Clarke issue back up. After Clarke's name came up once during Gonzalez-Pabon's cross-examination, the judge even asked Grullon's counsel if he would be delving further into the former special agent. Grullon's attorney answered: "No. No. No. No."

Given what transpired below, the government alleges Grullon either waived his right to appeal the Clarke ruling or, at best, forfeited it, garnering plain error review. Grullon contends he did not need to renew his objections to preserve them because the judge's ruling was final under Federal Rule of Evidence 103(b), not preliminary.[14] A look at the law suggests the government offers the better argument.

Where a judge issues an unconditional ruling on a motion in limine, the defendant need not renew the objection or take "additional steps to preserve the issue for appeal." United States v. Almeida, 748 F.3d 41, 50 (1st Cir. 2014) (quoting Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 35 (1st Cir. 2011)); see also United States v. Agosto-Vega, 731 F.3d 62, 65 n.6 (1st Cir. 2013) (citing Fed. R. Evid. 103(b)). On the other hand, when a judge issues a preliminary, conditional, or "tentative" ruling

---

[14] The rule reads: "Once the court rules definitively on the record -- either before or at trial -- a party need not renew an objection or offer of proof to preserve a claim of error for appeal."

that "clearly invites the party to offer the evidence at trial," then the party has an obligation to raise it again to preserve the claim. Almeida, 748 F.3d at 50 (quoting Señor Frog's, 642 F.3d at 35); see also Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003)).

As the judge announced and as Grullon's attorney understood, the ruling on the motion in limine was "preliminary," not final, and Grullon made no attempt to raise the Clarke evidence during trial. Accordingly, Federal Rule of Evidence 103(b) gives him no shield and he has not preserved the claim. See United States v. Takesian, 945 F.3d 553, 562 (1st Cir. 2019) ("We emphasize that Rule 103 requires the objecting party (here, [Grullon]) 'to clarify whether an in limine or other evidentiary ruling is definitive when there is doubt on that point.'") (quoting Crowe, 334 F.3d at 133). When Grullon's counsel responded to the judge's question during trial about whether he would be going further into Clarke's bad behavior with "No. No. No. No.," he intentionally relinquished, and thus waived, his right to appeal the denial of his motion in limine. See Olano, 507 U.S. at 733; United States v. Mitchell, 85 F.3d 800, 808 (1st Cir. 1996) (noting a defendant can commit waiver by "unequivocal[ly] assent[ing]" to a "direct inquiry from the court" about the issue which the defendant claims as error on appeal (quoting United States v. Marder, 48 F.3d 564, 571 (1st Cir. 1995))); see also United States v. Holmquist, 36 F.3d 154, 166 (1st Cir. 1994) ("[W]hen a judge

issues a provisional in limine pretrial order and clearly invites the [defendant] to offer evidence at sidebar for the purpose of reassessing the scope or effect of the order," the argument is waived unless the defendant "unsuccessfully attempts to offer such evidence in accordance with the terms specified in the [limine] order.").[15] We decline to consider the merits of Grullon's Clarke argument. See Hansen, 434 F.3d at 101.

## C. The Unredacted PSR

Recall that Grullon tried to access Gonzalez-Pabon's unredacted PSR and that the judge took the matter under advisement, but never issued a final ruling, and that neither he nor Grullon raised the subject again despite Gonzalez-Pabon's extensive testimony. Before us, Grullon says the district court erred in not ruling on and not giving him access to the unredacted PSR. For its part, the government asserts Grullon forfeited his right to appeal this issue because he never pressed for a ruling on the PSR request during the trial. Alternatively, the government contends Grullon waived the claim because he did not engage expressly with plain error review in his opening brief. See United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016) (appellant who

_____

[15] Grullon's counter that his counsel was complying with the judge's final order on the motion in limine and not intentionally relinquishing his right to bring in evidence of Clarke's misdeed is of no avail considering counsel stated on the record he understood the preliminary ruling.

does "not even attempt[] to meet his four-part burden" waives claim of plain error).  Responding to the government's assertions, Grullon essentially argues in his reply brief that his opening brief adequately addresses the plain error factors even if he didn't structurally describe it as a plain error analysis (he, in fact, claimed abuse of discretion applied, which we don't buy). As such, says Grullon, there is no waiver.  As to the government's forfeiture contention, we read Grullon's reply brief as a concession that he did not preserve the PSR claim below (thus acknowledging forfeiture) but he argues here that we should apply plain error review to this portion of his appeal.

Ultimately, we need not decide between waiver and forfeiture because "[w]here a defendant's claim would fail even if reviewed for plain error, we have often" simply proceeded to the merits.  United States v. Brake, 904 F.3d 97, 99 (1st Cir. 2018) (quoting United States v. Acevedo-Sueros, 826 F.3d 21, 24 (1st Cir. 2016)).  And we do so here, jumping to the "simplest way to decide" Grullon's allegations.[16]  United States v. McCullock, 991

---

[16]  To remind, to establish plain error, Grullon "must show not just (1) error, but (2) error that is clear, that (3) affected his substantial rights, and that (4) also seriously undermined the fairness, integrity, or public perception of his trial."  Takesian, 945 F.3d at 562-63 (citing United States v. Rivera-Carrasquillo, 933 F.3d 33, 48 n.14 (1st Cir. 2019)).

F.3d 313, 322 (1st Cir. 2021) (quoting Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013)).

With plain error review comes a checkpoint through which Grullon does not have the credentials to pass. To survive the "plainness" part of plain error review, defendants must explain for each of his claims how the trial judge disregarded some "controlling precedent": (1) telling judges what to do about the unredacted PSR; and (2) instructing judges about how to rule on discovery motions regarding PSRs. Id. (quoting United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016)). For neither issue did Grullon comply with the requirement. We briefly explain why.

Regarding access to the unredacted PSR, Grullon cites Supreme Court dicta noting that generally, courts are "very reluctant to give third parties access to the [PSR] prepared for some other" defendant because they fear a "chilling effect on the willingness of individuals to contribute information." U.S. Dep't of Just. v. Julian, 486 U.S. 1, 12 (1988) (disclosing portions of defendants' PSRs pursuant to Freedom of Information Act (FOIA) requests by those defendants). But Julian is not controlling as it dealt not with third-party requests for PSRs pursuant to a pretrial discovery motion, but instead with requests by defendants for their own PSRs pursuant to FOIA. Id. at 12-13. So Julian is not helpful. Neither is it helpful for Grullon that other circuits have adopted the dicta as their test for third-party access to

- 19 -

PSRs because those circuits do not control our law.[17] We have not yet had the opportunity to consider the <u>Julian</u> language, so there can be no plain error.[18] <u>See</u> <u>McCullock</u>, 991 F.3d at 32; <u>United States</u> v. <u>Romero</u>, 906 F.3d 196, 207 (1st Cir. 2018) ("With no binding precedent on his side, [defendant] cannot succeed on plain-error review unless he shows" that theory "is compelled" by constitutional law, statute, regulation, or other legal mandate);

---

[17] <u>See</u> <u>United States</u> v. <u>Schlette</u>, 842 F.2d 1574, 1581 (9th Cir. 1988), amended, 854 F.2d 359 (9th Cir. 1988); <u>United States</u> v. <u>Corbitt</u>, 879 F.2d 224, 238 (7th Cir. 1989) (quoting <u>Julian</u>, 486 U.S. at 12-13); <u>United States</u> v. <u>Charmer Indus., Inc.</u>, 711 F.2d 1164, 1175 (2d Cir. 1983) (requiring a "compelling demonstration that disclosure of the report is required to meet the ends of justice"); <u>United States</u> v. <u>Blanco</u>, 884 F.2d 1577, 1578 (3d Cir. 1989) (requiring "specific showing of the need for disclosure in the interest of justice"); <u>United States</u> v. <u>Pendleton</u>, 832 F.3d 934, 941 (8th Cir. 2016) (PSRs "should not be disclosed to third persons absent a demonstration that disclosure is required to meet the ends of justice") (quoting <u>United States</u> v. <u>McKnight</u>, 771 F.2d 388, 390 (8th Cir. 1985)); <u>United States</u> v. <u>Gomez</u>, 323 F.3d 1305, 1308 (11th Cir. 2003) (assuming "the 'compelling need' test controls the release of [presentence investigation information] to third parties"); <u>United States</u> v. <u>Figurski</u>, 545 F.2d 389, 391 (4th Cir. 1976) (because of the importance of the credibility of the prosecution's codefendant or coconspirator witness, disclosure of the PSR may be warranted when "the integrity of the judicial process [so] requires").

[18] Although Grullon points out that we have favorably quoted <u>Julian</u> regarding third-party access to PSRs, the quotation, as he alludes, was in dicta. <u>See</u> <u>In re Bos. Herald, Inc.</u>, 321 F.3d at 188 (noting, in the context of determining whether to require disclosure of other criminal justice materials, that PSRs are presumptively confidential documents and that "the courts have typically required some showing of special need before they will allow a third party to obtain a copy of a presentence report." (quoting <u>Julian</u>, 486 U.S. at 12)).

United States v. Marcano, 525 F.3d 72, 74 (1st Cir. 2008) (per curiam) ("[P]lain error cannot be found . . . absent clear and binding precedent.").[19]

As for the claim that the judge abused his discretion by not exercising his discretion,[20] see Brooking v. Branham, 727 F. App'x 884, 885-86 (7th Cir. 2018) ("[a] judge's failure to exercise

_____

[19] We pause to note that Grullon would not have been able to show error, let alone any error that would have affected his substantial rights, because he has demonstrated no compelling need to get additional impeachment evidence from the unredacted PSR. See United States v. Serrano-Mercado, 784 F.3d 838, 845 (1st Cir. 2015) (quoting United States v. Padilla, 415 F.3d 211, 218 (1st Cir. 2005)). Grullon provided no specific reasoning why the possible additional impeachment evidence would have altered or assisted his cross examination of Gonzalez-Pabon. See United States v. Allen, 716 F.3d 98, 105 (4th Cir. 2013) (defendant must provide specific information about PSR's exculpatory information to prevent a "fishing expedition every time a codefendant pleads guilty"). As Grullon admits, he had "other means of challenging [] Gonzalez-Pabon's credibility." And he could have obtained at least some of "the information in the [PSR] . . . from other sources," United States v. Molina, 356 F.3d 269, 275 (2d Cir. 2004), such as through cross examination or Gonzalez-Pabon's asylum applications, which the government provided, and which contained "a very long narrative about [Gonzalez-Pabon's] history in Venezuela." While it is true that Grullon could not know precisely what information was unredacted, Grullon has not "show[n] that the . . . available sources of information were not adequate" to challenge Gonzalez-Pabon's credibility, especially considering Grullon attacked Gonzalez-Pabon's credibility at length. United States v. Jewell, 614 F.3d 911, 922 (8th Cir. 2010); Blanco, 884 F.2d at 1577 (denying disclosure of third-party PSR because appellant's "motion advanced no reason why information in those reports would add significantly to what [appellant] already knew.").

[20] The government does not address this contention, but Grullon makes nothing of its failure to do so.

discretion is an abuse of discretion"), Grullon once more commits a fatal error by not pointing us to any controlling precedent holding that a judge must consider or must rule on a pretrial discovery motion. His citation to Seventh Circuit decisions (like the one just noted) do not discuss defendants, like Grullon, who received redacted versions of a cooperating coconspirator's PSR. They cannot therefore help him demonstrate plain error.[21]  See McCullock, 991 F.3d at 32; Romero, 906 F.3d at 207; Marcano, 525 F.3d at 74.

## II. Sentencing Enhancements

Grullon finally alleges the judge improperly applied two sentencing enhancements. First, he disputes the 2-level enhancement for being a leader in the conspiracy pursuant to U.S.S.G. § 3B1.1(c). Second, he asserts that the judge improperly calculated the amount of loss attributable to Grullon's participation in the conspiracy, which, in turn, led the judge to

---

[21] Our decision that Grullon cannot demonstrate plain error should not be misconstrued as this court having a position on the merits of his claim. That being said, we want to be clear that it would have been the better practice for the trial court to have issued a ruling on Grullon's pretrial discovery motion after explicitly taking it under advisement given Grullon's assertion that he needed material in the unredacted PSR for impeachment purposes. But even assuming error, Grullon has not demonstrated how such error affected his substantial rights (as is necessary to get relief) for the same reasons as discussed in note 19, especially considering he abandoned the issue at trial by not raising it. See Serrano-Mercado, 784 F.3d 838, 845.

enhance the TOL too heavily pursuant to U.S.S.G. § 2B1.1(b)(1)(I).
Neither claim has merit.

## A. Standard of Review

Unlike his evidentiary appeals, Grullon preserved his claims regarding the sentencing enhancements by objecting to them at the time of sentencing. Where a defendant has preserved an error for appeal, we review a sentencing court's decision for an abuse of discretion. See United States v. Rivera-Morales, 961 F.3d 1, 15 (1st Cir. 2020). Within that standard, we deploy a multifaceted analysis, but here the one important facet is that we review the court's findings of fact, such as Grullon's role in the offense and the amount of loss attributable to his actions, for clear error. See id.; United States v. Innarelli, 524 F.3d 286, 290 (1st Cir. 2008) (reviewing sentencing court's amount of loss calculation for clear error); United States v. Cadavid, 192 F.3d 230, 237 (1st Cir. 1999) (reviewing sentencing court's role-in-the-offense enhancement determination for clear error). "Given this algorithm, factbound battles over a defendant's role in an offense 'will almost always be won or lost in the district court.'" United States v. Vargas, 560 F.3d 45, 49 (1st Cir. 2009) (quoting United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995)). We "[d]raw[] all reasonable inferences in the light most favorable to the challenged finding" when analyzing challenges to sentencing

enhancements.  United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir. 2010).

## B. Role-in-the-offense enhancement

The U.S.S.G. provides an enhancement for any defendant who is "an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c).  Grullon argues the judge clearly erred by finding that he was an organizer or leader in the conspiracy because, in Grullon's words, Cohen was the "ringleader" who devised the laundering scheme and who recruited and controlled Gonzalez-Pabon.[22]

## i. Leadership over Gonzalez-Pabon

To earn the enhancement, the government must show by a preponderance of the evidence that the defendant did more than participate in shared criminal activity; he must have led or facilitated that criminal activity.  See Al-Rikabi, 606 F.3d at 14-15; United States v. Cortés-Cabán, 691 F.3d 1, 28 (1st Cir. 2012).  One way to demonstrate leadership is by "the degree of control and authority exercised over" at least one other person. United States v. Picano, 333 F.3d 21, 23 (1st Cir. 2003) (quoting U.S.S.G § 3B1.1, cmt. n.4).  A defendant can, however, play an essential role in the overall conduct without having any managerial

---

[22]  The enhancement also requires that there were "one to three other participants."  Al-Rikabi, 606 F.3d at 14 (citing U.S.S.G. § 3B1.1(c)).  Grullon smartly concedes that there were enough participants.

or supervisory capacity necessary to trigger the enhancement.  See United States v. Ramos-Paulino, 488 F.3d 459, 464 (1st Cir. 2007); United States v. Sostre, 967 F.2d 728, 733 (1st Cir. 1992).  Yet, it is not particularly difficult for the government to meet its burden.  The "[e]vidence of the defendant's role in the conspiracy may be wholly circumstantial, and need only show that he exercised authority or control over [one other] participant on one occasion." Cortés-Cabán, 691 F.3d at 28 (first alteration in original) (quoting United States v. Flores-de-Jesús, 569 F.3d 8, 34 (1st Cir. 2009)) (internal quotation marks omitted).

Unfortunately for Grullon, his reply brief all-but-admits he deserved the enhancement by citing to portions of the record where Gonzalez-Pabon testified multiple times to Grullon giving him "orders" and to Grullon making Gonzalez-Pabon further the conspiracy by joining his company, AD Professional.  See United States v. Cruz-Ramos, 987 F.3d 27, 44-45 (1st Cir. 2021) (ordering one other coconspirator enough for enhancement); Cortés-Cabán, 691 F.3d at 28 ("issu[ing] instructions" sufficient for role in offense enhancement).  Although Grullon is on better ground arguing that he did not control Cohen (as the government's brief argues), remember that the enhancement applies so long as Grullon, by a preponderance of the evidence, controlled at least one other person (Gonzalez-Pabon); whether Grullon controlled Cohen is therefore inconsequential.  See United States v. Prange, 771 F.3d 17, 34

(1st Cir. 2014).  The trial record and the PSR, upon which judges can rest sentencing decisions, had more than sufficient evidence for the enhancement, and we defer to the judge's view of the "raw facts" over ours.  See Picano, 333 F.3d at 24-25.

### ii. Enhancement disparity relative to Cohen

Perhaps because of the weakness of that argument, Grullon pivots, contending the enhancement was undeserved because the judge did not apply it to Cohen a few years earlier (recall that Cohen received fifty-four months imprisonment whereas Grullon received eighty-four).[23]  As we have said, we will "examine[] arguments . . . that a sentence was substantively unreasonable because of the disparity with the sentence given to a co-defendant."  United States v. Galindo-Serrano, 925 F.3d 40, 52 (1st Cir. 2019) (alteration and omission in original) (quoting United States v. Reverol-Rivera, 778 F.3d 363, 366 (1st Cir. 2015)) (modification in original), cert. denied, 140 S. Ct. 2646 (2020).  Although Congress drafted the criteria primarily with "national [sentencing] disparities" in mind, we also scrutinize whether "a sentence was substantively unreasonable because of the disparity with the sentence given to a co-defendant."[24]  Galindo-Serrano, 925

---

[23]  The government also neglects to engage directly with this argument, but Grullon once more makes nothing of it in his reply brief and neither will we.

[24]  Although tried separately, the grand jury indicted Cohen and Grullon together as codefendants.

- 26 -

F.3d at 52 (quoting Reverol-Rivera, 778 F.3d at 366). As the sentencing guidelines point out, the role-in-the-offense enhancement exists so as to allocate punishment appropriately based on "relative responsibility." U.S.S.G. § 3B1.1 (comment).

We turn down disparity claims when "material differences between" the defendant's "'circumstances and those of the more leniently punished confederates,'" justify the divergence, including the more severe criminal history of the more severely punished codefendant. Galindo-Serrano, 925 F.3d at 52 (quoting United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015)). To succeed, the "defendant must compare apples to apples," which means we pay close attention to "two identically situated defendants receiv[ing] different sentences from the same judge." Reyes-Santiago, 804 F.3d at 467 (quoting United States v. Rivera-Gonzalez, 626 F.3d 639, 648 (1st Cir. 2010)). Such cases, however, are unusual to say the least. See id.

The judge (who, recall, was the trial and sentencing judge for Cohen) explained at length why he found Grullon more culpable than Cohen, including that: (1) Grullon was an "architect" who "dr[ew] some people into" the scheme; (2) Grullon had a much lengthier criminal history than Cohen, who had none, which mattered for the judge's assessment of relative culpability even if the history did not alone add any offense levels under the sentencing guidelines; (3) Grullon, unlike Cohen, kept himself "in

the background" to "tak[e] advantage and us[e] the others" as fronts; and (4) unlike Cohen, Grullon would not be subject to the restitution order because Grullon would be deported to the Dominican Republic following his release from prison, and probation had no jurisdiction over him there.[25] Overall, the judge found Grullon "more culpable than Mr. Cohen" and without the "lifetime of good works" Cohen had apparently accumulated, which is why he felt comfortable giving Grullon a tougher sentence. There was no abuse of discretion given the judge's thoughtful reasoning about why he punished Grullon more harshly than Cohen. See Reverol-Rivera, 778 F.3d at 367; Vargas, 560 F.3d at 49 (trusting the factfinder at sentencing).

## C. Loss calculation enhancement

In fraud cases, like Grullon's, that result in financial losses for the victims, the defendant's sentence depends in part on the amount of loss incurred. See United States v. Flete-Garcia, 925 F.3d 17, 29 (1st Cir. 2019). The sentencing guidelines provide for a 16-level sentencing enhancement if the calculated loss is between $1,500,000.01 and $3,500,000.00. See U.S.S.G. § 2B1.1(b)(1). If the loss is instead between $550,000.01 and

---

[25] The judge was not punishing Grullon more harshly than Cohen because of a relative lack of funds. He noted that Grullon likely would not have to pay restitution as a "practical" difference between Grullon's and Cohen's circumstances since Cohen would remain subject to probation's jurisdiction in the United States.

$1,500,000.00, the enhancement is 14-levels. See id. The judge calculated the loss attributable to Grullon at over $1,600,000, thus subjecting him to the 16-level enhancement.

Grullon argues the enhancement should not apply because the government put forward insufficient evidence to prove he entered the conspiracy before September 2012. Thus, he says, he should not be responsible for losses prior to his moment of initiation. See U.S.S.G. § 1B1.3 (prohibiting counting conduct before defendant joined the conspiracy). By that time, Cohen had deposited about $700,000 in fraudulent checks. If, as Grullon contends, he is not responsible for that loss, then the judge should have only applied the 14-level enhancement ($1,600,000 - $700,000 = $900,000). Once more, we ask whether the judge committed clear error by finding that Grullon deserved the enhancement by a preponderance of the evidence, which is no easy goal for Grullon to accomplish. See United States v. Ramney, 298 F.3d 74, 80 (1st Cir. 2002).

The sentencing judge can, as we briefly mentioned earlier, base his conclusions on the PSR and on relevant conduct from the trial record. See Flete-Garcia, 925 F.3d at 28; Vargas, 560 F.3d at 49-50. Relevant conduct "includes acts that were part of the same course of conduct or common scheme or plan." United States v. Souza, 749 F.3d 74, 86 (1st Cir. 2014) (internal quotations and citation omitted), cert. denied, 574 U.S. 966

(2014). "A common scheme or plan involves acts connected by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." Id. at 86-87 (internal quotations and citation omitted). According to the Guidelines, "[a] defendant in a jointly undertaken criminal activity is liable for the loss resulting from acts directly attributable to him and for the loss resulting from the reasonably foreseeable acts of others taken in furtherance of the jointly undertaken criminal activity." United States v. Codarcea, 505 F.3d 68, 71 (1st Cir. 2007) (citing U.S.S.G. § 1B1.3(a)(1), (3)).[26]

The problem for Grullon is the jury's conviction. Although Grullon correctly notes that the district court cannot base its calculations on the indictment, see United States v. Pizarro-Berríos, 448 F.3d 1, 7 (1st Cir. 2006), here the jury convicted Grullon of participating in the conspiracy starting in October 2011. The evidence presented by the government thus demonstrated beyond a reasonable doubt that Grullon had joined in the conspiracy by October 2011. Because "beyond a reasonable doubt" is a higher burden of proof than "preponderance of the

---

[26] The government counters that Grullon ignored the appropriate legal standard by not discussing whether he should be held accountable for the losses resulting from the reasonably foreseeable acts of others in the joint criminal undertaking. See Codarcea, 505 F.3d at 71. Of course, if Grullon was not participating in the conspiracy before September 2012, then none of that loss would have been reasonably foreseeable to him. See U.S.S.G. § 1B1.3.

evidence," United States v. Robinson, 241 F.3d 115, 119 (1st Cir. 2001), evidence sufficient for a jury to convict can meet the mark for a judge to sentence. See Ramney, 298 F.3d at 80. And, remember, the judge could rely upon evidence put in front of the jury and in the PSR when calculating that Grullon caused a loss over $1,600,000 -- evidence such as Cohen opening accounts in the name of AD Professional (Grullon's business) into which Grullon deposited fraudulent checks, and the PSR's calculation of the total loss from the fraudulent checks going back to October 2011. See Pizarro-Berríos, 448 F.3d at 7 (evidence presented by government permissible way for court to calculate loss attributable); United States v. Newton, 327 F.3d 17, 30 (1st Cir. 2003) ("[I]t was well within the bounds of the court's discretion to credit evidence produced at trial and set forth in the government's sentencing memorandum."). We cannot therefore say that the judge committed clear error when calculating the amount of loss or abused his discretion by applying the 16-level enhancement.

## Conclusion

For the reasons set out above, none of Grullon's arguments convince us that he should have a new trial or a lesser sentence. **Affirmed**.